1. In determining whether an employee is a laborer within the meaning of the law providing for laborers' liens, he is to be classified, not according to the arbitrary designation given to his calling, but with reference to the character of the services required of him under his contract of employment. If the services thus contemplated were to consist mainly of work requiring mental skill or business capacity, and involving the exercise of his intellectual faculties, rather than work the doing of which properly would depend upon mere physical power to perform ordinary manual labor, he would not be a laborer within the statute as to lien. If, on the other hand, the services to be performed under his contract were to consist mainly of manual labor, he would be a laborer within the meaning of such statute. Oliver v. Macon Hardware Co., 98 Ga. 249 (2) (25 S.E. 403, 58 Am. St. R. 300); Stothart v. Melton, 117 Ga. 460 (43 S.E. 801); Tabb v. Mallette, 120 Ga. 97 (2) (47 S.E. 587, 102 Am. St. R. 78); Tuten v. Cudahy Packing Co., 133 Ga. 509 (66 S.E. 249).
2. While the facts that the intervenor may have been employed as a pharmacist and as manager of a drug-store, and to do whatever was necessary to operate it, might not necessarily mean that he was not a laborer, yet the burden was on him to show that the general services thus contemplated by his oral contract of employment were to consist mainly of manual labor, and not merely that the services which he did perform consisted mainly of such labor. Howell v. Atkinson, 3 Ga. App. 58
(59 S.E. 316). 3. Whether the contract of employment as indicated above contemplated performance of all the manual services that were actually performed, was a question of fact, and under the evidence, a finding in favor of the lien was not demanded as a matter of law. Compare Baker v. Richmond City Mill Works, 105 Ga. 225, 227 (31 S.E. 426); Jennings v. Stripling, 127 Ga. 778 (3) (56 S.E. 1026). Accordingly, the judge trying the case by consent without a jury did not err in finding against the claim of the intervenor as a laborer; and this is true although he specifically found from the evidence that the manual services actually rendered predominated over all other services. In this view, it is unnecessary to pass upon the other questions raised. See J. B. Withers Cigar Co. v. Kirkpatrick, ante, 41.
Judgment affirmed. All the Justices concur, except Duckworth,J., who dissents.
 No. 14494. APRIL 15, 1943. *Page 49 
This case arose out of the same creditor's proceeding as J.B. Withers Cigar Co. v. Kirkpatrick, ante, 41. A. W. Bell intervened for the purpose of asserting a laborer's lien. He had not previously foreclosed his lien in the manner provided by statute, but his intervention was filed within the time allowed for statutory foreclosure, and he sought the same relief thereby. The receiver objected to this intervention, on the grounds that (1) the claimant could not for the first time in this equitable proceeding assert his laborer's lien and claim priority over general creditors, and (2) he was employed by the debtor as a druggist and manager, and was not a laborer within the meaning of the statute providing for laborer's lien. The issues were by consent submitted to the judge without a jury. He found against the lien on the second objection, and entered judgment accordingly. Bell excepted.
It is contended by the receiver that the evidence showed that the intervenor was not a laborer; but that in any event the judgment should be affirmed, since, as insisted, the lien was not foreclosed in the manner prescribed by law. The evidence, so far as material, was as follows:
The intervenor testified: "My name is A. W. Bell. I had occasion to do some work for the defendant in this case, Mrs. John R. (Mrs. Lillian) Kirkpatrick Junior. That was in reference to the operation of a drug-store. My agreement with her was verbal. I was employed to take over the store and operate it for the defendant, do what was necessary. I did that. I went there approximately the first of August last year. I left there about the 17th or 18th of October. Regarding what services I performed to earn this $290 that is due me — I did everything that had to be done around the store, from sweeping the floor to working the soda fountain. When I entered in the morning I opened the store. After opening the store I would usually bring in the ice. The ice would be sitting outside. The ice man would come before the store opened, and I was the first to bring it to the fountain. I actually brought the ice in. On the early delivery fifty pounds of ice was brought to start with; then he came back. I would bring the ice from the sidewalk to the soda fountain. It came in one lump from the ice factory. I shaved it with a shaver. I did that myself. *Page 50 
During the time that I was there I had some help, off and on, at the soda fountain. I had a boy for a while, and would lose him and get another one. When the boy was there I went right ahead and served sandwiches. We did not serve meals. We toasted the sandwiches. I served them. The drug-store operated what is known as curb service. By that I mean carrying the lunches out and serving them to the cars in front of the drug-store. I did that part of the time. They had tables where lunches were served. Drinks or coffee were served along with the lunches. I prepared them. After customers came in and were served, I cleaned the tables. When the floor of the place of business became littered with trash I usually cleaned up the trash. I would do that with a broom or with my hands. I did dusting in the drug-store. If any one came in and desired to purchase some drugs, I handed the purchases to the customers. We purchased the drugs wholesale. They were packed in containers. I handled those packages. I placed the goods on the shelf. At night I closed the store. I mixed the drinks that were served to the public, if I didn't have a soda man. At least seventy-five per cent. of the work consisted of the things that I have recited or related to the court. I had something to do with mixing the drugs. We had a good drug business. We would not average but five or six prescriptions a day. Handling those prescriptions, considering the whole day's labor, would take about twelve and a half per cent. of my time. The other time was devoted to all the other things that had to be done around the store.
"I am a registered pharmacist. I went out there as a registered pharmacist to operate the store. I was not there at the time of Mr. Kirkpatrick's death. I went there after he passed away. I did not have another pharmacist that came on to relieve me. I opened and closed. I opened about 8 o'clock in the morning. I closed at 10:30 and 11:00 at night. The location was next door to the Woman's Club. Most of the time I had only one delivery boy. That was a negro. He came to work at the time I did. He stayed until I left at night. His duties were to help there in the drug-store and deliver on a motorcycle prescriptions and orders that came in. I did not have a boy that came in from school and worked at the soda fountain, not while I was there. I did not have a boy that worked in the soda fountain in the afternoon and *Page 51 
at night. The biggest end of the trade was at night when parties were on at the Woman's Club. I had a boy that helped at the soda fountain part of the time. It would be hard to say how many days I had those boys. They kept switching. I would have a boy about a week. He would go, and for a period I would not have anybody, and would get another one. For three weeks I was absolutely alone in the store. The rest of the time I would have a boy. This negro boy would come in later after I had opened up the store, and chip up the ice and put it around the milk bottles. I was always the first one there. When he came in he helped. When prescriptions came in and I had the drugs, I filled the prescriptions. I did not have a shortage with reference to prescriptions that were given me, and did not have the drugs with which to fill them and got them filled at another drug store. I either got the drugs or gave them back the prescription. During the time that I operated the drug-store I could not tell you what the total sales were per day. Approximately one third of the sales per day were at the soda fountain. As to whether the other two thirds was either prescriptions or medicine on the shelves and other merchandise sold, we broke that down some more, because we carried all the bottled drinks, Red Rock. This negro did not sweep the store every day. If it was swept every day, I swept it. He swept it sometimes. I am not saying he did not sweep it some. My compensation was approximately $50 a week.
"I left there about the 17th or 18th of October. I performed all the service that I was called on to perform. When asked on cross-examination about the value from the standpoint of cash received, that would be based upon a dollar value rather than upon labor value, the question that I answered upon cross-examination. On the question of labor value the statements I gave his honor on direct examination is still the division of the way I was working. Mrs. Kirkpatrick was running the store. She was the owner. The drug-store trade or business was going on. I left before the receiver was appointed."
Two other witnesses testified that they were salesmen for wholesalers and frequently visited the store and place of business where Bell was employed, and that he was the "buyer." They also testified as to the duties and labors that he performed, corroborating in a general way the testimony of Bell himself. The receiver testified *Page 52 
as to the nature of the business and the condition of things at the time he took possession. He testified that Bell was not working at the store at this time, and that he had no knowledge as to what Bell did.
The court rendered the following order and judgment: "The objections by the receiver to the claim of A. W. Bell that his claim was entitled to priority of payment as a laborer's lien are sustained, this court finding, as a matter of fact, that the said A. W. Bell, being employed as a pharmacist and manager of the defendant's drug-store, was not a laborer as contemplated by the statute establishing liens in favor of laborers, although the court finds from the evidence that manual services of A. W. Bell predominated over all other services performed by him. Therefore, there being no question as to amount, judgment is rendered in his favor in the sum of $290, with the same rank and dignity as the judgments enumerated in paragraph 2 of this order."